**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

SHAREENA BROOKS,

    Plaintiff,

v.

MICHAEL P. ROETTING, et al.,

    Defendants.

Case No: 1:24-cv-266

Bowman, M.J.

# MEMORANDUM OPINION AND ORDER[1]

On March 7, 2024, Plaintiff filed this civil rights case in state court against City of Cincinnati Police Officer Michael P. Roetting and two John and Jane Doe police officers, alleging injury as a result of being tased by Defendant Roetting. Defendants removed the case to this court. Currently pending is Defendants' motion for judgment on the pleadings. For the reasons stated, Defendants' motion will be GRANTED.

## I. Allegations of the Complaint

Plaintiff alleges that she was initially pulled over for a minor traffic offense, but was placed under arrest on suspicion of driving under the influence and transported to the District Three police station to be processed and for further testing, despite allegedly having "consumed no alcohol prior to operating her vehicle." (Doc. 6 at ¶ 8, 10-13). At the police station, she was taken to a "DUI room," also referred to as the intoxilyzer room.

---

[1]The parties have consented to disposition before the undersigned magistrate judge. *See* U.S.C. § 636(c) and Doc. 18 (transferring case to the undersigned).

While in that room, one of Plaintiff's arms was handcuffed to a metal rail while she was seated in an adjacent chair. (*Id.*, ¶ 14).

During the incident in which Defendant Roetting deployed his taser against her, Plaintiff alleges that she "pos[ed] no risk of physical harm to any of the officers," and that she was not able to flee due to being handcuffed to a railing. (*Id.*, ¶¶ 19, 20). She alleges that Defendants "failed to de-escalate the situation" and that Officer Roetting instead tased her in her chest in violation of police policy. (*Id.*, ¶15, 16, 18, 20). She further alleges that neither of the two John and Jane Doe officers "stepped in to intervene or stop" Defendant Roetting from using his taser. (*Id.*, ¶23). Immediately after deploying his taser, Defendant Roetting instructed Plaintiff to put her hands behind her back, warning "I'm going to light you up again" if she did not comply. (*Id.*, ¶17).

In her first claim, Plaintiff alleges that Defendant Roetting's use of his taser constituted excessive force under state law. (*Id.*, ¶ 22, 44-45). In a second claim, she alleges that all three Defendants "intentionally and purposely deprived Plaintiff of her constitutional right to be free from excessive force" under 42 U.S.C. § 1983. (*Id.*, ¶ 49). And in a third claim, Plaintiff alleges that the City of Cincinnati failed to train, supervise, or discipline Defendant Roetting based on his history of "bad behavior and mistreatment of citizens." (*Id.*, ¶ 52).

**II.  Standard of Review**

The standard of review for a motion for judgment on the pleadings under Rule 12(c) is the same as the standard for a motion to dismiss under Rule 12(b)(6), with review generally limited to the pleadings. *See Morgan v. Church's Fried Chicken*, 829 F.2d 10, 11 (6th Cir. 1987). In considering Defendants' Rule 12(c) motion, the court "must construe

2

the complaint in the light most favorable to the plaintiff [and] accept all of the complaint's factual allegations as true." *Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 512 (6th Cir. 2001) (citations omitted). But the Sixth Circuit also has held that when considering the plausibility of a complaint that alleges excessive force against a police officer, a court may consider video footage of the incident when "the videos are clear and blatantly contradict or utterly discredit the plaintiff's version of events." *Saalim v. Walmart, Inc.*, 97 F.4th 995 (6th Cir. 2024) (quoting *Bell v. City of Southfield, Michigan*, 37 F.4th 362, 364 (6th Cir. 2022) (additional citations omitted)).

### III. Analysis of Defendant's Motion

#### A. Plaintiff's State Law Claim of Excessive Force is Time-Barred

Defendant Roetting persuasively argues that Plaintiff's first claim, that he violated state law by using more force than necessary when he deployed his taser, is barred by Ohio's one-year statute of limitations. In his response to Defendant's motion, Plaintiff concedes that point. Therefore, Defendant's motion will be granted as to Plaintiff's state law claim.

#### B. Plaintiff's Federal Claims

##### 1. The Video Evidence is Admissible

Defendant Roetting's argument that he is entitled to judgment on Plaintiff's federal excessive force claim rests heavily on the admissibility of the video record of the incident. Plaintiff argues that the video footage should not be considered by this Court under Rule 12. While Plaintiff readily admits that the video evidence accurately depicts "an expanded view of what occurred," (Doc. 16 at PageID 165), she suggests that the video does not in fact "blatantly contradict" or "utterly discredit" her allegations such that the evidence may

3

be considered. Instead, Plaintiff maintains that the video record is consistent with her allegations. *See Saalim v. Walmart*, 97 F.4th at 1002 (holding that a trial court erred in considering otherwise-relevant video evidence under Rule 12 because even defendants conceded it was "wholly consistent" with the complaint).

The Court disagrees. The video record is both admissible under Rule 12(c) and dispositive. Upon review, the video footage fully discredits an implicit allegation-by-omission that Plaintiff was not actively resisting the officers at the time, as well as her express allegation that she posed no risk of harm to anyone. Both allegations are critical to Plaintiff's excessive force claim. Because the referenced facts are central to the issue of qualified immunity, and are depicted on video that blatantly contradicts Plaintiff's allegations regarding the same, the Court considers the video evidence without converting Defendants' motion to one for summary judgment. *See Bell v. City of Southfield, Michigan*, 37 F.4th at 364 (holding that "when uncontroverted video evidence easily resolves a case, we honor qualified immunity's principles by considering the videos" at the motion-to-dismiss stage).

As in the controlling *Bell* case, the video first contradicts a key factual *omission* concerning the need for force – the fact that Plaintiff was engaged in active physical resistance.

> Bell alleges only that the officers "tased [him] when there was no need to do such." R. 21, Pg. ID 241. In our hypotheticals, that would be the equivalent of omitting evidence of a threat - like the presence of a gun. Bell fails to mention that he continued resisting the officers as they attempted to restrain him on the ground. The video clearly shows Bell moving his left arm away from Officer Langewicz multiple times before the officer tased him. The video blatantly contradicts the silence in Bell's account.

4

*Id.*, 37 F.4th at 367. In the above-captioned case, the video similarly reflects that Plaintiff was actively resisting being handcuffed at the time that Defendant Roetting deployed his taser. In her response in opposition, Plaintiff does not dispute that she was engaged in the active resistance that is depicted.

In addition to contradicting Plaintiff's silence regarding her active resistance, the video contradicts Plaintiff's closely-related express allegation that she posed no risk of physical harm to the officers. (*See* Doc. 6 at ¶¶ 16, 18). In contrast to that allegation, the video record reflects a rapidly evolving situation where Plaintiff's violent physical resistance posed a risk to the involved officers as well as to herself. Both videos clearly depict the critical moments at issue.

Therefore, this Court reviews and accepts Defendants' verified video evidence to support the Rule 12(c) motion to the extent stated. The contrary allegations made by Plaintiff in her complaint (including the critical omission of her active resistance and the threat of injury posed by that resistance) are rejected as "implausible" in the face of the video record.

### 2. Defendant Roetting is Entitled to Qualified Immunity

Based on the video record, Defendant is entitled to qualified immunity in his individual capacity on Plaintiff's § 1983 claims. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815, (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982)). Qualified immunity "'gives ample room for mistaken judgments by protecting 'all but the plainly

incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341, 106 S.Ct. 1092 (1986)); *see also Dorsey v. Barber*, 517 F.3d 389, 394 (6th Cir. 2008). Qualified immunity applies regardless of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact. *Pearson*, 555 U.S. at 231, 129 S.Ct. 808.

Qualified immunity is judged by two inquiries that may be determined in either order. First, viewing the facts in a light most favorable to the plaintiff, the court must determine whether the plaintiff has shown that a constitutional violation has occurred. Second, the court must determine whether the claimed right was clearly established at the time of the violation. *Pearson*, 555 U.S. at 232, 129 S.Ct. 808. In other words, the Court determines whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights. *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996).

Plaintiff was a pretrial detainee. Therefore, in order to prove that excessive force was used against her in violation of the Fourteenth Amendment, she is required to show "only that the force purposely or knowingly used against [her] was objectively unreasonable." *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473, 576 U.S. 389, 396-97 (2015). To determine whether an officer's use of force was objectively reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or

6

attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 1872 (1989). In conducting its inquiry, a court must view events "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." *Id.*, 490 U.S. at 396-97, 109 S.Ct. at 1872. Applying this standard, many tasing cases in the Sixth Circuit rise and fall on the issue of whether a suspect is actively resisting arrest or attempting to evade arrest, or the closely-related issue of whether an officer's safety is threatened. See *Shanaberg v. Licking Cnty., Ohio*, 936 F.3d 453, 456 (6th Cir. 2019) (finding the threat to officer safety to justify the use a taser, citing *Thomas v. City of Eastpointe*, 715 Fed. Appx. 458, 460 (6th Cir. 2017) for its review of case law holding that use of a taser is justified when a suspect exhibits "active resistance.").

      The video evidence from the District Three station camera confirms that Plaintiff was seated at what appears to be a desk with her left wrist handcuffed to the metal rail in a corner of the DUI room. The room is very small, appearing on the video to be approximately 6-7 feet wide. During the first hour of the video, Plaintiff appears calm. In fact, at one point around 3:08 a.m., Officer Jane Doe, holding what appears to be a urine sample cup, uncuffs Plaintiff and escorts her from the room, returning at approximately 3:11 a.m. and re-cuffing her left wrist at that time. At 3:27:40 a.m., additional officers briefly appear, including a gloved male officer who takes out a stethoscope and blood pressure cuff, and another female officer who appears to record Plaintiff's vital signs.

Throughout the medical examination, which concludes at 3:30:40, Plaintiff continues to be calm and cooperative. However, a few minutes after the medical exam, Plaintiff starts moving around in her seat, touching her head repeatedly and pulling on her shirt in a manner that's suggestive of some agitation. She briefly settles again, resting her head in her hands. During this time, the two "John and Jane Doe" officers[2] stand nearby (within 3 feet), paying little attention to Plaintiff and conversing while holding paperwork. As the scene unfolds, Defendant Roetting stands just outside the doorway, holding a water bottle while looking into the room.

At 3:40:49:41, Plaintiff exhibits increased agitation, pounding her free right fist on the desktop/small table in front of her. The commotion causes Officer John Doe to turn toward Plaintiff, who continues to pound the table. Two seconds later, Plaintiff raises her right fist higher and forcefully pounds the table a fourth time. She begins to stand as Officer John Doe steps toward her. (Station Video 3:40:51:447). Setting down his papers, Officer John Doe reaches for her right arm in order to secure her free right hand. But Plaintiff vigorously and successfully resists his attempts to secure her over the next several seconds, using her legs, free arm, and body to evade his grasp.[3] Approximately six seconds into his struggle, at 3:40:57:34, Officer Jane Doe steps in to assist. In response, Plaintiff's resistance intensifies. In addition to using her free arm to push Officer John Doe away, Plaintiff steps up onto the chair on which she had been seated and then onto the adjacent desktop. She briefly crouches above the officers until Officer Jane Doe is able to grab her left leg and force her back down. (Station Video 3:40:59 – 3:41:04).

---

[2]Defendants' motion to dismiss identifies Officer Jane Doe as Officer Hurd, and John Doe as Officer Fischer. To be consistent with the complaint, the Court will refer to them as Jane and John Doe.
[3]Officer John Doe nearly lost his balance at one point, though he did not fall. (3:40:57 – 3:40:58).

Plaintiff's movements to evade the officers' attempts to fully secure her are frustrated only partly by her left wrist being handcuffed to the railing.[4] For several more seconds, her physical resistance to being subdued and handcuffed proves effective.

Observing his fellow officers' struggle, Officer Roetting strides from the doorway into the room to assist at the same time that Plaintiff steps up onto the chair. He drops his water bottle into a nearby trash can before turning toward the melee. Over the next seconds (Station Video 3:41:04 – 3:41:06), Plaintiff appears to push Officer John Doe and moves her free hand toward Defendant Roetting, who has withdrawn his taser from its holster and is positioned slightly behind and between his fellow officers. At 3:41:06, Defendant Roetting aims his taser directly at Plaintiff's chest and briefly discharges it. (Station Video 3:41:07). In response, Plaintiff falls toward the floor. (Station Video 3:41:14). Officer John Doe catches her as she falls and places her back in the chair (3:40:20). Officer John Doe then removes the newly subdued Plaintiff's left handcuff from the railing, handcuffs both of Plaintiff's hands behind her back, and – together with Officer Jane Doe and Roetting - escorts her out of the room. (Station Video 3:41:22 – 3:43:16).

In short, the video therefore confirms that Defendant Roetting very briefly deployed his taser a single time during a rapidly evolving and volatile confrontation during which Plaintiff went from sitting calmly to a state of extreme agitation, actively resisting two officers' attempts to further secure and subdue her. During the roughly 18 seconds that elapses from the start of the incident until Defendant used his taser, Plaintiff continually escalates her resistance, using her legs and body to fight with and evade the officers trying to subdue her, as well as her free right hand and arm.

---

[4] Although unable to flee, her wrist was able to slide along the length of the railing as she evaded the officers during her struggle.

**The Lack of a Constitutional Violation**

Defendant Roetting is entitled to qualified immunity because Plaintiff cannot show that a constitutional violation has occurred. Plaintiff does not deny that she was actively resisting the officers' attempts to handcuff her, but denies the extent to which her actions posed any genuine threat by emphasizing that one arm remained secured to the wall, so that Defendant Roetting and the John and Jane Doe officers "had the ability to simply move away from Plaintiff" to avoid harm to themselves. (Doc. 16, PageID 170).

But Plaintiff's argument epitomizes the "20/20 vision of hindsight" view that *Graham* eschews. The physical altercation arose rapidly in very tight quarters and presented a legitimate threat of injury to the officers as well as to Plaintiff herself, as she continued to flail her free arm and to contort and move her legs and body to evade being subdued and handcuffed. Because Plaintiff was actively resisting being further restrained and posed a threat of harm, she cannot show that Defendant Roetting's use of his taser to regain control of the highly volatile situation was objectively unreasonable.

> Generally, taser use has been found reasonable when the suspect was actively resisting and unreasonable where the suspect was not. *Thomas v. City of Eastpointe*, 715 F. App'x 458, 460 (6th Cir. 2017); *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015) ("Active resistance to an officer's command can legitimize an officer's use of a [t]aser."). For example, verbal hostility, deliberate acts of defiance, physically struggling with police, and refusing to be handcuffed are considered forms of active resistance. *Thomas*, 715 F. App'x at 460; *Goodwin*, 781 F.3d at 323; *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 509 (6th Cir. 2012). "There is no clearly established right for a suspect who 'actively resists' and refuses to be handcuffed to be free from [t]aser application." *Goodwin*, 781 F.3d at 323 (quoting *Hagans*, 695 F.3d at 509).

*Spradlin v. Primm*, 581 F.Supp.3d 837, 844 (E.D. Ky. 2022). A plaintiff engages in "active resistance" when they are "out of control" and "forcefully ... resist arrest," *or* when the individual is "highly intoxicated, volatile, and uncooperative," or "moving around violently."

*Saalim v. Walmart*, 97 F.4th at 1005 (collecting cases, internal quotation marks and citations omitted). "By contrast, when individuals behave nonviolently and are merely noncompliant, this Court has found that they are only passively resisting arrest, which weighs against the reasonableness of a use of force." *Id.*

Plaintiff's reliance on the recent *Saalim* case in aid of her claims is misplaced. In sharp contrast to the record here, the arrestee had been engaged in only "passive resistance" when the officer *twice* deployed his taser.

> The facts alleged in Saalim's complaint paint the following picture. After an approximately 30 second interaction in which Saalim did not produce his driver's license when requested, Bretzloff - without first asking Saalim to exit the vehicle and giving him time to comply - opened the cab's door and attempted to force him out of the cab by grabbing Saalim's arm. Another 30 seconds later, Saalim exited the cab, and Bretzloff "shoved" him against the side of the cab. Compl., R. 1, Page ID #14. Then, Saalim turned to speak to Bretzloff. A few seconds later, while Saalim was facing the cab and his back was to Bretzloff, Bretzloff pulled out handcuffs. Saalim then turned around to face Bretzloff again, and stood against the cab "with both hands visible and empty," at which point Bretzloff tased him. *Id.* at Page ID #15. Approximately eight seconds later, Bretzloff tased Saalim again. …Saalim's mere turning to face Bretzloff does not indicate active resistance to being handcuffed. The complaint does not allege that he jerked his hands away or that he hid his hands to try and avoid being handcuffed. To the contrary, it alleges that the moment before he was tased, Saalim had both of his hands visible and empty. And it does not contain other indicia of active resistance.

*Saalim v. Walmart, Inc.*, 97 F.4th at 1008. Unlike cases of active resistance in which officers were granted qualified immunity for their use of force, the Sixth Circuit denied qualified immunity because Saalim's behavior did not appear to be erratic and dangerous, and he took no other "more drastic measures to avoid being handcuffed." *Id.*, 97 F.4th at 1006-08. In the case presented, however, the video evidence depicts Plaintiff engaging in very active resistance to the officers' attempts to restrain her free right hand, taking "drastic measures" to avoid being fully handcuffed.

11

**The Lack of a "Clearly Established" Constitutional Right**

Even if a reviewing court were to disagree with the above analysis, Defendant Roetting would still be entitled to qualified immunity because Plaintiff cannot show that use of a taser under the circumstances violated a clearly established constitutional right. "The critical threshold step is defining the right at issue." *Finley v. Huss*, 102 F.4th 789, 808 (6th Cir. 2024). Plaintiff points to the Sixth Circuit's pronouncement that "by 2020…it was clearly established in this circuit that an individual has a constitutional right not to be tased when he or she is not actively resisting." *Saalim,* at 1010 (internal quotation and additional citation omitted).

But that is not the right that Plaintiff asserts, because the uncontroverted video evidence confirms that she *was actively resisting* being fully handcuffed. So the issue presented is whether it was clearly established that an individual has a constitutional right not to be tased when she *is* actively resisting, is not subdued, and is only partially restrained.

> Existing precedent clearly establishes a violation when controlling authority - that is, a Supreme Court decision, published Sixth Circuit decision, or here, a [district court]… decision - bars the official's conduct. *See Ortega*, 737 F.3d at 439-40. It can also establish a violation when an on-point and "robust consensus of cases of persuasive authority" places the violation beyond debate. *Id*. Such authority cannot just suggest that the officials' conduct was unlawful. *Wesby*, 583 U.S. at 63, 138 S.Ct. 577. Rather, it must make apparent that the conduct was unlawful under the circumstances.

*Finley v. Huss*, 102 F.4th 789, 808 (6th Cir. 2024). Plaintiff cites to no controlling precedent that clearly establishes Plaintiff's right not to be tased when actively resisting and only partially restrained.

In all of the cases on which Plaintiff relies, the individuals were *fully* subdued and not actively resisting when force was deployed. In those cases, being completely

12

handcuffed/restrained and immobilized eliminated any threat. *See*, *e.g.*, *Michaels v. City of Vermillion*, 539 F. Supp.2d 975, 985 (N.D. Ohio 2008) (in a case without video, crediting plaintiff's account, finding repeated gratuitous use of a taser against a fully handcuffed suspect who was not resisting). But here, the undisputed video evidence shows that, despite being hampered by one handcuff, Plaintiff was able to use her remaining free limbs in active resistance.

During the critical time period, Plaintiff was out of control. The facts presented in this case are similar to those presented in *Bell v. City of Southfield, Michigan*, 37 F.4th at 367. There, the Sixth Circuit granted qualified immunity to an officer who employed a taser where the video evidence showed the individual was engaged in "active resistance" by repeatedly pulling his arm away to avoid a handcuff, even after being verbally warned he would be tased if he didn't comply. *Id.*, 37 F.4th at 368; *see also Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 509 (6th Cir. 2012) (finding active resistance, and thus no constitutional violation, when officers tased a plaintiff who refused to allow officers to secure his arms behind his back). The *Bell* court noted that "the officers… couldn't get control over either of Bell's arms before Langewicz tased him once" in order to gain control. *Id.* at 368.

In response to Defendant's motion, Plaintiff asserts that the lack of a verbal warning by Defendant Roetting before he discharged his taser also provides a basis for denying qualified immunity. But the presence or lack of a verbal warning prior to the use of a taser is only one aspect to consider in light of the "totality of circumstances." And again, Plaintiff cites to no controlling case that establishes a constitutional right to a verbal warning prior to using a taser against an actively resisting detainee. Given that Plaintiff's

13

resistance so quickly placed officers in harm's way notwithstanding her relatively limited ability to inflict serious injury, this Court will not second guess Defendant Roetting's split-second decision to employ a taser in order to quell the threat.

In a final argument, Plaintiff asserts that Defendant Roetting deployed his taser in violation of a Cincinnati Police Policy that prohibits the use of a "frontal" taser shot "except in the situation[] of self-defense or defense of another." (Complaint at ¶24). Plaintiff further asserts that Defendants violated Section 12.545 of the same policy, which states that "*whenever possible* de-escalation techniques shall be employed to gain voluntary compliance by a subject." (*Id*. at ¶ 26 (emphasis added)). Plaintiff's argument presupposes that this Court will ignore the video evidence that shows that Plaintiff's active resistance did pose a danger to Officers John and Jane Doe. So Roetting's taser use arguably did not violate City policy on the record presented. But even if the taser use violated some aspect of the City's policy,[5] no controlling case law equates a violation of municipal policy with constitutional injury. Therefore, the alleged policy violation does not defeat Defendant's motion for judgment.

### 3. Defendant is Entitled to Judgment on Plaintiff's *Monell* Claim

Plaintiff has named Defendant Roetting in both his individual and official capacities. "While personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law, individuals sued in their official capacities stand in the shoes of the entity they represent." *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)) (cleaned up). "A suit against an individual in his official capacity is the equivalent of a suit against the

---

[5]Plaintiff's assertion that Defendant Roetting's taser use violated police policy arguably undercuts any contention that the City should be held liable because its "policy" was the "moving force" behind her injury.

governmental entity." *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) (citing *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 68 (1989)). In other words, Plaintiff's third claim seeks recovery under 42 U.S.C. § 1983 from the City of Cincinnati. Defendant is entitled to judgment as a matter of law on this claim.

While the City of Cincinnati is a governmental entity that could theoretically act under color of state law, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1245-46 (6th Cir. 1989). Thus, to state a claim for relief against the City of Cincinnati for plaintiff's alleged injuries, the complaint must allege facts showing that the misconduct giving rise to plaintiff's injuries was the result of a policy, statement, regulation, decision or custom promulgated by the City. *Bright v. Gallia Cnty., Ohio*, 753 F.3d 639, 660 (6th Cir. 2014) (citing *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 556 (6th Cir. 2003)); *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). "[P]laintiff must adequately plead (1) that a violation of a federal right took place, (2) that the defendants acted under color of state law, and (3) that a municipality's policy or custom caused that violation to happen." *Bright*, 753 F.3d at 660 (citing *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008)); *see also Polk County v. Dodson*, 454 U.S. 312 (1981) (municipal policy must be "moving force" behind constitutional deprivation).

For the reasons discussed above, Plaintiff cannot show that Defendant Roetting violated any clearly established constitutional right, or that the City's policy or custom caused a constitutional violation.

15

### IV. Conclusion and Order

Accordingly, Defendant Roetting's motion for judgment on the pleadings (Doc. 13) is **GRANTED**, with this case to be **DISMISSED.**

                                        *s/Stephanie K. Bowman*
                                        Stephanie K. Bowman
                                        United States Magistrate Judge